IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICKEY CATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 21-CV-377-SMY |
| | ) |
| ALLIANCE COAL, LLC et al, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Hamilton County Coal, LLC and White County Coal, LLC's Motion to Dismiss Plaintiff's Complaint in part under Fed. R. Civ. P. 12(b)(6) (Doc. 24), and Defendant Alliance Coal, LLC, Alliance Resource Partners, L.P., Alliance Resources Operating Partners, L.P., and Alliance Resource Management GP, LLC's ("Alliance Defendants") Motion to Dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, and in the alternative, for failure to state a claim as to Count III under Fed. R. Civ. P. 12(b)(6) (Doc. 25). Plaintiff Rickey Cates responded in opposition (Docs. 45, 46). For the following reasons, Defendants' motions are **DENIED**.

## BACKGROUND

Cates filed the instant collective and class action, individually and on behalf of all other similarly situated persons, alleging violations of the Fair Labor Standards Act ("FLSA"), Illinois Minimum Wage Law ("IMWL"), and Illinois Wage Payment and Collection Act ("IWPCA") (Doc. 1). He makes the following allegations in the Complaint (Doc. 1): Cates and all putative class members worked as miners in Defendants' Hamilton Mining Complex in Hamilton County, Illinois and Pattiki Complex in White County, Illinois ("Illinois Mines") under Defendants' policies and practices. The Alliance Defendants own and control each of the Subsidiary

Defendants: Hamilton County Coal, LLC (Hamilton Mining Complex) and White County Coal, LLC (Pattiki Complex) and "uniformly established and directed" the "employment policies and procedures" used by Hamilton County Coal and White County Coal (Doc. 1 ¶¶ 17).

Cates and numerous other similarly situated current and former employees at the Illinois Mines are or were in non-exempt positions.[1] Defendants unlawfully failed to pay current and former coal miners for "off-the clock" work, overtime, and non-discretionary bonuses. The uncompensated "off-the-clock" work included: time spent dressing in personal protective clothing and gear; visiting various locations to gather tools; attending safety meetings; and returning personal protective clothing and gear after shifts were completed (Doc. 1 ¶¶ 49-55).

In addition to being paid on an hourly basis at an agreed hourly rate, Cates and other coal miners were entitled to be paid various types of bonuses (Doc. 1 ¶¶ 19, 48). The '*Benefits Handbook*' provided to Cates and other coal miners described the bonus compensation that they would be entitled to as part of their work for Defendants (Doc. 1 ¶ 62). Defendants failed to pay the coal miners at the proper overtime rate for certain non-discretionary bonuses because the bonuses were not included in the "regular rate" for the purposes of determining the appropriate overtime rate (Doc. 1 ¶¶ 60-66). These bonuses included an attendance incentive bonus, a weekly production bonus, a safety incentive bonus, and others (Doc. 1 ¶¶ 63-66). Additionally, Defendants used a "boosted hours" formula that did not compensate the coal miners for the full overtime premium owed (i.e., excluding off-the-clock work in calculating the bonuses) (Doc. 1 ¶ 66).

---

[1] "Non-exempt" refers to employees who are not exempt from the protections of the FLSA and the Illinois Minimum Wage Law, working in positions entitled to be paid overtime compensation for work performed in excess of forty (40) hours per week.

## **DISCUSSION**

### Rule 12(b)(2) – Jurisdiction

The Alliance Defendants contend that they lack the minimum contacts with the State of Illinois necessary for the Court to exercise personal jurisdiction over them. In reviewing a Rule 12(b)(2) motion to dismiss, the Court "take[s] the plaintiff's asserted facts as true and resolves any factual disputes in its favor." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423-424 (7th Cir. 2010). When as here, the Court rules on a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, "the plaintiff bears only the burden of making a prima facie case for personal jurisdiction." *Id.* at 423.

A federal court exercises personal jurisdiction over a defendant according to the law of the forum state. *Hyatt Intern. Corp v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In Illinois, personal jurisdiction over a nonresident defendant is premised "on any basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 Ill. Comp. Stat. § 5/2-209(a-c) (Long-Arm statute). As such, "due process requires only that in order to subject a defendant to judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Personal jurisdiction may be either general or specific.

### *General Jurisdiction*:

To set out a prima facie case for general jurisdiction, Cates must show that the Alliance Defendant's contacts with Illinois are such that they are essentially taking up a physical presence in this state. *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). The Alliance Defendants are a multi-tiered system of partnerships and limited liability companies organized in the State of

Delaware with their principal places of business in Oklahoma (*see* Doc. 1 at ¶¶ 8-11).  More specifically:

- Alliance Resource Partners, L.P. heads up the organization and is operated by its general partner, Alliance Resource Management GP, LLC.  (Doc. 46-5 at p. 4).

- Alliance Resource Management GP, LLC operates in Illinois through its direct operation of Alliance Resource Partners, L.P. and has been registered to do business in the State of Illinois since 1999.  (Doc. 46-8).

- Alliance Resources Operating Partners, L.P. is a wholly-owned subsidiary of Alliance Resource Partners, L.P. and acts as the holding company for Alliance Coal.  (*Id.* at p. 6).

- Alliance Coal, LLC is a wholly-owned subsidiary of Alliance Resources Operating Partners, L.P. and acts as a holding company for the various LLC's (including Hamilton County Coal ("Hamilton") and White County Coal ("Pattiki")) that own the coal mines in seven states, including the Illinois mines (Hamilton and Pattiki).  (*Id.* at pp. 6, 9, 10).  Alliance Resource Partners, L.P. identifies Alliance Coal as "the holding company for the coal mining operations of Alliance Resource Operating Partners, L.P."  (*Id.* at p. 4).  Alliance Resource Operating Partners, L.P. facilitates the mining operations by providing significant working capital, as well as a $100 million accounts receivable securitization facility used to purchase trade receivables of the coal mining operations.  (*Id.* at pp. 19-20).  Alliance Coal holds 100% direct ownership in the various mining operations in Illinois and other states.  (*Id.* at pp. 30-31).  Alliance Coal is responsible for administration of payroll, human resources, employment benefits, accounts payable, and other managerial and operational support activities for the mining operations.

- Essentially the same group of people manage and operate all of these interrelated entities.  (Docs. 46-5 at pp. 22-27; 46-6).

Regarding the extent of the Alliance Defendants' operations in this state, the exhibits and evidence provided reveal the following:

- Tom Wynne is the Senior Vice President and Chief Operating Officer for ***Alliance Resource Partners, L.P.***  "In his new role, Tom's strong leadership skills and vast experience will serve us well ***as he assumes the responsibilities of directing the day-to-day operations for all of Alliance's coal mines***."  (Doc. 46-9) (emphasis added).

- Payroll and human resources for the mines are based in Tulsa under the offices of Layne Herring (the Vice President of Compensation and Payroll) and Paul Mackey (Vice

President of Employee Health & Benefits)[2]; and, both are administered through Alliance's Oracle E-Business Suite which includes applications for human resources, payroll, purchasing and accounts payable, to coordinate operations at each of the mine sites with the Tulsa home office. (Doc. 46-10 at ¶12; Doc. 46-21). A Payroll Clerk at each mine was responsible for collecting timekeeping data for the time worked by miners and transferring that data to the Alliance Coal office in Tulsa. (Doc. 46-10 at ¶5). Tulsa would then process the miners' and office personnel's time records and pay them via direct deposit. (*Id.*). All mine employees could access their paystubs online using Alliance Resource Partners, L.P.'s website or Alliance Coal's website. (Id.). These same timekeeping and payment practices were followed by all of the mines operated by Alliance Coal, including those in Illinois. (*Id.* at ¶7). Any pay raises or terminations of employment (for either miners or office personnel) were not made without the Tulsa office's approval. (*Id.* at ¶17). The miners received clothing and uniforms that depicted the word 'Alliance' and/or a large 'A' company logo. (*Id.* at ¶16; Doc. 46-15 at ¶13). The office personnel all used work email addresses with the 'ARLP.com' domain name. (Doc. 46-10 at ¶16; Doc. 46-15 at ¶13).

- Alliance Resource Operating Partners, L.P. maintains the bank accounts for the Alliance entities; and, it is also responsible for borrowing from lending institutions to fund the operations of the Alliance coal mine operations and subsidiaries. (Doc. 46-7 at pp. 21-23). The regional office in Lexington was responsible for "operations management, land management, legal, worker's comp, engineering and permitting, government affairs, information technology and accounting services." (Doc. 46-35). It was generally the Lexington office that provided, maintained, and approved for payment the invoices and purchase orders for the various mines. (Doc. 46-15 at ¶¶ 3-4).

- Tom Wynne, the Senior Vice President and Chief Operating Officer for Alliance Resource Partners, L.P., is also one of the executive primarily responsible for regulatory filings, including, but not limited to, his correspondence with the Mine Safety and Health Administration to support the passage of Mine Improvement and New Emergency Response Act of 2006. (Doc. 46-36). Mr. Todd Beavan, Manager of Permitting & Environmental Compliance, has also been involved in the regulatory activities for the Illinois mines when he corresponded to the Illinois Department of Natural Resources in 2019 requesting a modification to White County Coal's permit. (Doc. 46-37; Doc. 46-38).

- The Alliance Movants are also dedicated to their Illinois business interests in that they have engaged in lobbying and spending significant amounts in campaign contributions through the offices of Alliance Resource Partners, L.P.'s Heath Lovell, Vice President of Public Affairs and a direct reporter to Joseph W. Craft III, the President and CEO. (Doc. 46-39). In total, the Alliance Movants have handed out nearly $24 million in federal campaign contributions and nearly 70-90% of the coal industry spending in the Illinois gubernatorial and legislative races. (Doc. 46-48). In connection with the campaign contributions,

---

[2] Paul Mackey reports to R. Eberly Davis. Mr. Davis is responsible for the day-to-day business decisions for the Alliance Movants and is an officer of Alliance Resource Management GP, LLC. He is also responsible for health benefits and workers' compensation, including for Alliance Coal and its subsidiaries. (Doc. 46-7 at pp. 15-17).

- Alliance has also invited various Illinois lawmakers to the Illinois mines; and, they have contributed to the lawmakers' campaigns who attended an energy regulation session. (Doc. 46-42; Doc. 46-44; Doc. 46-45). The Alliance Movants are members of the Illinois Coal Association and the Coal Institute, both lobbyist organizations for the coal industry. (Doc. 46-46; Doc. 46-47). Beyond contributions to politicians and organizations, Alliance Movants are also the recipient of more than $1.9 million in grants from the Illinois Department of Commerce and Economic Opportunity. (Doc. 46-49).

- Various Alliance executives have also made in-person contacts with Illinois regarding the coal business. Mr. Joe Craft, the CEO, has traveled to Illinois for events like a round table even at the Illinois Basic Coal & Mining Expo Symposium. (Doc. 46-50). Mr. Brian Cantrell, Senior Vice President and Chief Financial Officer, has traveled to Illinois for hearings regarding Alliance's mining operation expansion at the Gibson Mine into Wabash County. (Doc. 46-52; Doc. 46-53).

While the Alliance Defendants argue that they merely "own" the Illinois Mines and do not exercise "any meaningful control", the Court disagrees. The entities are engaged in all major aspects of the Illinois mines, including day-to-day operations, sales, payroll, human resources, employee benefits, payables, regulatory and lobbying. It is clear that they operate a mining business in Illinois, that the companies do not exist independently, and that these Defendants continuously and deliberately participate in more than mere hands-off ownership of the Illinois mines. As such they must reasonably anticipate being hailed into court in Illinois. S*ee, Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (personal jurisdiction appropriate where "respondent is carrying on a 'part of its general business' in [the forum state])").

### *Specific Jurisdiction*

Specific jurisdiction depends on "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283 (2014). "As the Supreme Court has emphasized, it is essential not only that the defendant have *minimum contacts* with the forum state but also that the plaintiff's claim against the defendant arise out of or relate to those contacts." *uBID.*, 623 F.3d at 429. Minimum contacts are met where (1) a defendant has purposefully directed its activities at the forum state or purposefully availed itself of the privilege of conducting business in that state,

and (2) the alleged injury arises out of the defendant's forum-related activities. *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). Here, the Alliance Defendants argue that Cates has not and cannot allege any viable facts demonstrating that the Alliance Movants exercised any high degree of control over Hamilton County Coal or White County Coal relative to their alleged employment practices or otherwise engaged in any activity in Illinois that gave rise to Cates' alleged overtime claim.

A defendant is not subject to specific personal jurisdiction based merely on random, fortuitous, or attenuated contacts – there must be a real relationship with the state with respect to the activities at issue. *Northern Grain Marketing, LLC. V. Greving*, 743, F.3d 487, 493 (7th Cir. 2014). The previously detailed facts regarding the Alliance Defendants' activities and operations sufficiently demonstrate that they have purposefully availed themselves of the privilege of doing business in Illinois. Every Alliance entity has some connection to the Illinois mines and have directed their actions toward Illinois.

The evidence also shows a sufficient nexus between the Alliance Defendants' contacts and activities within this state and Cates' asserted claims. Cates' employment by one of the Illinois mines operated and maintained by the Alliance Defendants and the employment practices of that mine directly gave rise to the claims in this case.

Moreover, Illinois has an obvious interest in providing a forum for litigating its residents' claims. Given that the Alliance Defendants have operated coal mines in Illinois for the past two decades, have related ties to Illinois, and have availed themselves of the privilege of doing business in Illinois, this Court exercising personal jurisdiction over them would not offend traditional notions of fair play and substantial justice. *See*, *Curry*, 949 F.3d at 402 (citing *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945)) (the court must determine whether the exercise of

personal jurisdiction over the out-of-state defendant would offend traditional notions of fair play and substantial justice); *Summertime Produce, LLC v. Atlantic Produce Exchange, LLC,* 2020 WL 2489708 at *4 (7th Cir. 2003).

For the foregoing reasons, the Court finds that a Cates has made prima facie showing that both general and specific jurisdiction exists.

### Rule 12(b)(6) – Count III: Illinois Wage Payment and Collection Act

Defendants Hamilton County Coal, LLC and White County Coal, LLC (Doc. 24) and the Alliance Defendants (Doc. 25) seek to dismiss Count III of Cates' claim under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. § 115/4, arguing that Cates has failed to state a viable cause of action and his claim fails as a matter of law (Doc. 24). More particularly, they argue that Cates fails to allege the existence of an enforceable agreement between he and Defendants, and absent such an agreement, there can be no actionable IWPCA violation (*Id*. at 4).

When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts as true all allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The federal system of notice pleading requires only that a plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the allegations must be "more than labels and conclusions." *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008). This requirement is satisfied if the Complaint (1) describes the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and (2) plausibly suggests that the plaintiff has a right to relief above a speculative level. *Twombly*, 550 U.S. at 555; *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

To plead a viable IWPCA claim, a plaintiff must allege the existence of wages or final compensation [that] is due to an employee from an employer under an employment contract or agreement. *See Landers-Scelfo v. Corporate Office Sys., Inc.*, 827 N.E.2d 1051, 1058 (Ill. App. Ct. 2d Dist. 2005) (citing 820 ILCS 115/2, 3, 5). The term "employment agreement" for purposes of the IWPCA is construed broadly and reaches far beyond a contract. *Id.* at 1067-68. To satisfy the IWPCA, an agreement need not be "formally negotiated or written," *Dobrov v. Hi-Tech Paintless Dent Repair, Inc.*, No. 1:20-CV-00314, 2021 WL 1212796, at *5 (N.D. Ill. Mar. 31, 2021), and need only amount to "a manifestation of mutual assent on the part of two or more persons" that an employee will perform work in exchange for compensation. *Id.*; *see also Snell-Jones v. Hertz Corp.*, No. 19-cv-00120, 2020 WL 1233825, at *6 (N.D. Ill. Mar. 13, 2020).

Construing the relationship between Cates and Defendants broadly, Cates' allegations suffice to establish an employment agreement: there was an agreed hourly rate for the coal miners' work, and that they would be classified as non-exempt from overtime; the coal miners were not paid for all hours worked at the agreed rates; the "*Benefits Handbook*" set forth nondiscretionary bonuses that were wrongly excluded from the coal miner's regular rate for the purposes of calculating overtime; and the "*Benefits Handbook*" established an agreement for safety and production bonuses, and the formulas Defendants used to calculate those bonuses incorrectly excluded off-the-clock work. These allegations suggest a mutual agreement between Cates and Defendants that Cates was to perform work in exchange for compensation and are therefore sufficient to state a colorable IWPCA claim in Count III.

For the above-stated reasons, Defendants' Motions to Dismiss (Docs. 24, 25) are **DENIED**.

**IT IS SO ORDERED.**

**DATE: October 3, 2022**

_____
**STACI M. YANDLE**
**United States District Judge**